

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

NICOLE WHITLEY,

              Plaintiff,

              v.

CITY OF PORTLAND and
ROBERT DAY,

              Defendants.

CV. 07-1114-AC

FINDINGS AND
RECOMMENDATION

---

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

Defendants the City of Portland ("City") and Sergeant Robert Day ("Sgt. Day") move for

PAGE 1 - FINDINGS AND RECOMMENDATION          {MEP}

summary judgment on all of plaintiff Nicole Whitley's ("Whitley") claims: (1) gender discrimination; (2) retaliation; (3) wrongful discharge; and (4) equal protection. First, Whitley alleges that the City treated her differently than similarly situated male employees, and that her gender impacted the City's decision to terminate her employment, which was in violation of Title VII and OR. REV. STAT. 659A.030(1)(a) and (b). (Pl.'s Mem. in Opp. 1.) Second, Whitley claims that she was terminated by the City because she reported inappropriate and sexually harassing behavior, and that such a termination is retaliatory under Title VII and OR. STAT. 659.030(f), and is a violation of OR. REV. STAT. 659A.203. (Pl.'s Mem. in Opp. 1.) Third, Whitley alleges that her termination gives rise to a common law wrongful discharge claim either due to her reports of gender discrimination and retaliation or because she used the City's disability insurance system. (Pl.'s Mem. in Opp. 1.) Finally, Whitley alleges that Sgt. Day denied her equal protection of the law in violation of 42 U.S.C. § 1983. (Pl.'s Mem. in Opp. 1.) For the following reasons, the City's motion for summary judgment on Whitley's gender discrimination claims should be granted, the City's motion for summary judgment on Whitley's retaliation and whistleblower claims should be denied, the City's motion for summary judgment on Whitley's wrongful discharge claim should be granted, and Sgt. Day's motion for summary judgment on Whitley's equal protection claim should be granted.

*Factual Background*

A.  Whitley's Training Experience

The Portland Police Bureau ("Bureau") hired Whitley on October 20, 2005. (Babnick Aff.[1]

---

[1]All of the exhibits offered by Whitley, with the exception of Exhibit 35 which was offered with her reply memorandum, were attached to the Concise Statement of Material Facts filed by the City and Sgt. Day. Initially, the Babnick and Johnston affidavits authenticating the majority of the

Ex. 3 at 1.) On January 9, 2006, Whitley went to the Department of Public Safety Standards and Training Basic Academy (the "Academy") to begin basic police training. (Babnick Aff. Ex. 3 at 1.) Whitley received five hours of orientation training at the Academy and received the Student Conduct Guide (the "Guide"). (Babnick Aff. Ex. 3 at 1; Johnston Am. Aff. Ex. 5.) Whitley signed a statement to "attest that I have read, understood and subscribe to the Student Conduct Guide." (Johnston Am. Aff. Ex. 5.) The Guide sets forth four standards of conduct relevant to these motions. First, it explains that the Academy has "Zero Tolerance" for "[d]ishonesty, lying or attempting to conceal violations." (Johnston Am. Aff. Ex. 4 at 2.) A violation of this policy will result in "[i]mmediate and appropriate corrective action by Academy staff who will do what is necessary to prevent recurrence of the misconduct." (Johnston Am. Aff. Ex. 4 at 2.) Second, the Guide states that the "minimum passing score for all written examinations is 75%." (Johnston Am. Aff. Ex. 4 at 3.) Third, "[s]tudents are required to attend all scheduled Academy classes," and students are "responsible for notifying their agency supervisor in advance of any absence." (Johnston Am. Aff. Ex. 4 at 3.) "Any unauthorized absence may result in dismissal from the Academy." (Johnston Am. Aff. Ex. 4 at 3.) Finally, "[s]tudents are expected to be seated in the classroom 5 minutes prior to the start of each class. Tardiness demonstrates disrespect and is unacceptable." (Johnston Am. Aff. Ex. 4 at 3.) Importantly, the Department of Public Safety Standards and Training ("DPSST") sets

---

exhibits referenced the exhibit by number and indicated that they were attached to the respective affidavit. In response to a telephone call from the court pointing out the error in the affidavits, an amended affidavit of Jennifer Johnston was filed correcting the reference to the exhibits to indicate that they were attached to the Concise Statement of Material Facts, not the affidavit. While an amended affidavit George Babnick was not filed, it is clear that the exhibits referred to in the Babnick Affidavit are those filed with the Concise Statement of Material Facts. The court finds that the exhibits referenced in the Babnick affidavit, as well as those referenced generally in the Day affidavit, have been adequately authenticated on the record. All of the citations to the exhibits will be through the authenticating affidavits, not the Concise Statement of Material Facts.

the standards and training requirements for police officers. OR. REV. STAT. 181.640. Under Oregon law, a police officer who does not successfully complete the Academy cannot work as a police officer. OR. REV. STAT. 181.655(1)(b).

In January of 2006, Whitley began demonstrating performance deficiencies in basic training at the Academy. On January 18, 2006, Whitley failed to shoot qualifying scores on day three of handgun firearms training. (Babnick Aff. Ex. 7.) On January 24, 2006, Whitley failed shotgun firearms training because she was "unable to demonstrate basic proficiencies in manipulating, shooting, and the safe handling of the shotgun." (Babnick Aff. Exs. 8, 9.) When Lieutenant Raymond Rau ("Lt. Rau"), Whitley's supervising training coordinator at the Academy, reported Whitley's firearm deficiencies to Sgt Day, he indicated that it "wasn't a big issue" and that the Bureau could just "remead [her] up there and tell me [she's] good." (Babnick Aff. Ex. 3 at 2; Oldham Dec. Ex. 6 at 3-4.)

On February 1, 2006, Lt. Rau called Whitley out of class and into a meeting. (Whitley Dep. 23:12-14.) During the meeting, Lt. Rau informed Whitley "that an instructor at EVOC [Emergency Vehicle Operation Course]) was offended because [Whitley's] nipples were showing through [her] shirt." (Whitley Dep. 23:23-25.) Lt. Rau asked Whitley what she was wearing, if she was wearing a jogging bra, and if she had a bra. (Whitley Dep. 23:25-24:2) Lt. Rau then suggested that Whitley try "maybe some type of layering" to deal with the issue. (Oldham Decl. Ex. 6 at 9.) Whitley was in shock, was "blown away," and did not know how to respond to Lt. Rau's comments. (Whitley Dep. 24:28-19.) She could not believe that she was being asked these questions; she felt uncomfortable and that she was being singled out. (Whitley Dep. 24:20-23.)

Whitley described her meeting and conversation with Lt. Rau to Field Training Officer Joe

PAGE 4 - FINDINGS AND RECOMMENDATION                                    {MEP}

Schilling ("Officer Schilling") on February 2, 2006. (Schilling Dep. 129:15-16.) Officer Schilling "immediately" reported his conversation with Whitley to Sgt. Day because it "was a significant event at the [A]cademy for one of [the] probationary officers, and part of [his] job description is to convey those things along to [his] superior officer." (Schilling Dep. 135:25; 136:11-15.) In a inter-office memorandum from Officer Schilling to Sgt. Day dated February 2, 2006, Officer Schilling explained that Whitley told him she "felt 'singled-out' by Lt. Rau, was offended by having someone talk to her about her breasts and was now self-conscious around the instructor staff. [She] further offered that she felt like wearing her jacket all the time." (Oldham Decl. Ex. 18.)

On the evening of February 2, 2006, Sgt. Day and Whitley had a conversation in which they discussed Whitley's February 1 conversation with Lt. Rau. (Oldman Decl. Ex. 23.) Whitley expressed concerns that she had offended an instructor, was being singled out and would face problems in the future. By the end of February 3, 2006, and after various conversations between Whitley, Sgt. Day, and Lt. Rau, Whitley reported that while she still did not like the fact that the conversation occurred, she felt much better about the situation and that DPPST had resolved the matter. (Oldham Decl. Ex. 23.) Specifically, in her conversations with Sgt. Day, Whitley stated that she did not want to make a complaint about her meeting with Lt. Rau, but that Lt. Rau's statements "shouldn't have been said." (Whitley Dep. 107:3-6; (Whitley Dep. 107:3-6; Day Aff. Ex. 28 at 2.) She also expressed concern that she would be "singled out." (Day Aff. Ex. 28 at 2.) Sgt. Day asked Whitley if there was "anything else [she would] like from [him] or the Bureau, or from DPSST" or whether she felt like they had "come to a resolution . . . ." (Day Aff. Ex. 28 at 2.) Whitley responded "I feel fine now . . . I'm fine with it." (Day Aff. Ex. 28 at 2.)

Whitley continued to demonstrate performance deficiencies at the Academy. On February

6, 2006, Whitley received a report critique from an instructor at the Academy regarding Whitley's first report-writing assignment. (Whitley Dep. 127:19-23; Babnick Aff. Ex. 12.) Whitley did not meet DPSST standards in content and word choice, organization, or mechanics. (Johnston Am. Aff. Ex. 12.) Whitley received a 67.4% on her second written exam at the Academy (Babnick Aff. Ex. 14 at 2), which is a failing grade. (Johnston Am. Aff. Ex. 4 at 3.) Whitley passed all of her class-room subjects but was ranked forty-first out of forty-two students in her class. (Johnston Am. Aff. Ex. 6; Day Aff. Ex. 14 at 2.)

Additionally, Whitley engaged in conduct that violated provisions of the Guide. On February 2, 2006, Whitley was assigned a use-of-force remediation report. (Whitley Dep. 136:5-10.) The report was due on the morning of February 6, 2006 (Whitley Dep. 136:13-14), but Whitley did not bring her report to class that morning. (Whitley Dep. 137:9-14.) She told Lt. Rau that she left the report at home, and her mother could email it to her. (Whitley Dep. 137:17-21.) Lt. Rau gave Whitley an additional assignment of an event report to explain why she failed to turn in her use-of-force remediation report on time. (Whitley Dep. 137:14-15.) Whitley understood that she was supposed to turn in the event report with the remediation report. (Whitley Dep. 138:13-15). That day, before Whitley had a chance to call her mother about the remediation report, she fell in the Academy parking lot and sustained a knee injury. (Whitley Dep. 139:20-23.) Whitley went to the hospital that evening to have her knee examined and treated, and missed class on February 8, 2006. (Day Aff. Ex. 24.) Whitley failed to contact her mother and ask her to email her the report. (Whitley Dep. 165:24-166:6.) She claims that she "forgot about the report" and "spaced it off." (Whitley Dep. 166:5-9.) Whitley did not turn in either the remediation report or the event report until February 9, 2006. (Johnston Am. Aff. Ex. 34.)

PAGE 6 - FINDINGS AND RECOMMENDATION                                    {MEP}

Whitley was counseled for being tardy to class on at least one occasion. On February 8, 2006, Whitley was late to a class. (Whitley Dep. 150:2-6.) Her tardiness violated the Guide's protocol that expects students "to be seated in the classroom 5 minutes prior to the start of each class." (Johnston Am. Aff. Ex. 4 at 3.) Whitley's instructors, Trooper Snook and Sergeant Plumber ("Sgt. Plumber"), both recall Whitley saying she was late to class because her sergeant, Sgt. Day, kept calling her. (Day Aff. Ex. 18; Ex. 19 at 1.)

Whitley violated the requirement that she attend all optional classes for which she was registered. Whitley signed up for three optional classes, Radar 1, Radar 2 and Lidar, all scheduled sometime between January 31, 2006 and February 8, 2006. (Whitley Dep. 108:8-14.) Whitley was aware that she was required to notify either Sergeant Tate or Lt. Rau if she would be absent from an optional training for which she had signed up. (Whitley Dep. 109:13-18.) Nevertheless, Whitley did not notify either Sergeant Tate or Lt. Rau when she could not attend either Radar class. (Whitley Dep. 112:7-19.) Whitley indicated that she did not attend the Lidar class because she "forgot about [it]." (Whitley Dep. 117:2-13.) Whitley again failed to inform anyone that she would not be attending the class. (Whitley Dep. 121:10-13; 121:24-122:5.) On February 9, 2006, Sgt. Day asked Whitley about the reasons for her absences from the optional classes. (Day Aff. Ex. 17 at 5-6.) Whitley told him that she missed the classes because she and her sons were sick, and her grandma was dying in hospice. (Day Aff. Ex.17 at 5-6.)

On February 8, 2006, Whitley received a disability in the line of duty form ("DILD form") by fax from Sgt. Day relating to her knee injury. (Whitley Dep. 152:22-153:11.) The front of the fax contained a note from Sgt. Day that asked Whitley to call him when she received the forms "for explanation." (Day Aff. Ex. 15; Whitley Dep. 153:10-11.) Whitley claimed that she called Sgt. Day

PAGE 7 - FINDINGS AND RECOMMENDATION                                        {MEP}

and got his voicemail. (Whitley Dep. 153:20-15.) Whitley completed and signed the DILD form on February 15, 2006. (Johnston Am. Aff. Ex. 24.) The DILD form stated that it is an application for disability benefits and "when signed this report becomes notice of claim." (Johnston Am. Aff. Ex. 24.)

As a result of her knee injury, Whitley was physically unable to receive training in Con Sim 1 through 4, Defensive Tactics 3 through 8, Building Searches 1 and 2, and Vehicle Stops 1 and 2. (Babnick Aff. Exs. 20-23) This lack of training precluded Whitley from graduating from the Academy. (Whitley Dep. 300:15-22.) Because Whitley did not graduate from the Academy, she could not advance to Phase I training. (Whitley Dep. 82:1-6.)

On February 9, 2006, Lt. Rau called Sgt. Day and reported his concerns with Whitley's performance deficiencies. (Oldham Decl. Ex. 5.) On February 13, 2006, Officer Schilling forwarded a memorandum to Sgt. Day in which he recommended a Probationary Performance Review ("Review") for Whitley because of the "repetitive nature of her performance concerns in the academy setting . . . ." (Day Aff. Ex. 30 at 1-2.) In the recommendation, Officer Schilling documented Whitley's "performance concerns," which began on January 31, 2006. The areas of concern were summarized as:

January 31, 2006:    Failed to attend training class.
                                 Failed to notify DPSST Coordinator of absence.
                                 Failed to notify Bureau Supervisor of absence.

February 1, 2006:    Failed to attend training class
                                 Failed to notify DPSST Coordinator of absence.
                                 Failed to notify Bureau Supervisor of absence.

February 6, 2006:    Failed to complete assigned coursework.
                                 Failed to submit event report as assigned by DPSST Coordinator

February 7, 2006:    Failed to complete assigned coursework.

February 8, 2006:      Failed to contact Sgt. Day upon paperwork receipt as directed.

February 10, 2006:    Failed to submit required paperwork to Sgt. Day as directed.

(Day Aff. Ex. 30 at 1-2.)  There is no evidence that shows when the particular DPSST official reported or recorded each of the enumerated performance concerns.

On February 24, 2006, Whitley met with Diane Avery of the City's Diversity Development/Affirmative Action Office (the "Office") to make a complaint of sexual harassment stemming from the February 1 conversation with Lt. Rau regarding Whitley's anatomy and intimate apparel. (Babnick Aff. Ex. 29.)  On March 1, 2006, the Office sent a letter to Whitley saying that it had determined that the information provided by Whitley "did not substantiate that [Whitley] was subjected to sexual harassment based on [her] membership in a protected class" and advising that it declined to investigate Whitley's complaint. (Babnick Aff. Ex. 29.)

On April 5, 2006, the Bureau convened a Review for Whitley "to address performance issues in the following areas: Knowledge of Bureau Rules and Procedures, Attitude towards Police Work, Field Performance: Non-Stress Conditions [and] Truthfulness." (Babnick Aff. Ex. 3 at 1.)  With the exception of truthfulness, the performance issues were identical to those outlined in Officer Schilling's memorandum of February 13, 2006. (Babnick Aff. Ex. 3 at 1-2.)  Four Bureau employees -- Captain George Babnick ("Captain Babnick"), Lieutenant David Famous ("Lt. Famous"), Sgt. Day, and Officer Schilling – attended the Review. (Famous Dep. 116:11-19; Oldham Decl. Ex. 12 at 1.) After the meeting, Captain Babnick asked each of the other three officials for his recommendation on whether Whitley should be terminated. (Famous Dep. 116:19-21.)  Lt. Famous was the only official who recommended that Whitley be retained. (Famous Dep. 116:21-117:11.)

On May 12, 2006, Captain Babnick summarized Whitley's Review in a memorandum to

PAGE 9 - FINDINGS AND RECOMMENDATION                                    {MEP}

Portland Police Chief Rosanne Sizer ("Chief Sizer").  (Babnick Aff. Ex. 3.)  Captain Babnick

outlined Whitley's performance deficiencies, which occurred from January 31, 2006, to February 10,

2006, in more detail than Officer Schilling's memorandum.  He then concluded that:

> Attention to detail and following established policies and procedures are fundamental
> requirements for succeeding in a law enforcement career.  Officer Whitley repeatedly
> failed to pay attention to important details, failed to follow established procedures,
> and failed to follow the direction of Sergeant Day by calling him upon receipt of the
> faxed Disability in Line of Duty forms.

> While it is normal for recruit officers to sometimes fail to meet acceptable
> performance standards, repetitive deficiencies in the same areas cause concern as to
> their ability to function effectively as Portland Police Officers.  Officer Whitley has
> demonstrated repetitive performance deficiencies.  After extensive deliberation and
> discussion with training Divisions staff, I recommend that Probationary Officer
> Whitley be terminated from the Portland Police Bureau for failure to meet
> performance standards.

(Babnick Aff. Ex. 3 at 2-3.)  Again, this memorandum contained no evidence of when each

performance deficiency was reported or recorded.

Captain Babnick also noted that Whitley's truthfulness became a concern during the Review

process.  He wrote that:

> As vital as it is for officers to adhere to policies, procedures, and direction from
> supervisors, being completely honest when responding to questions, whether the
> questions come from supervisors, judicial officials, or citizens, is paramount.
> Integrity is one of the Bureau values and is a fundamental requirement of being a
> Portland Police Officer.

> During the Probations Performance Review, Training Division staff had concerns
> regarding the truthfulness of some statement made by Officer Whitley.  I have
> attached an Appendix that summarizes Officer Whitley's response to each
> performance deficiency and indicated when the truthfulness of her response is in
> question.

> As noted in the attached Appendix, some statement made by Officer Whitley are
> directly contradicted by others and indicate a pattern of untruthfulness.  I do not
> believe these contradictions can simply be attributed to being under stress, suffering
> from a painful knee, or being flustered.  These contradictions may not conclusively

prove deliberate untruthfulness by Officer Whitley, but they are very troubling.

(Babnick Aff. Ex. 3 at 3.)

Assistant Portland Police Chief Dorothy Elmore ("Asst. Chief Elmore") agreed with Captain Babnick's recommendation that Whitley be terminated. (Babnick Aff. Ex. 3 at 1.) By letter dated May 22, 2006, Chief Sizer advised Whitley of her decision to terminate Whitley's employment, explaining that:

> A Probationary Performance Review to determine your continued status as a probationary officer has been completed. Based on this review, Captain Babnick of the Training Division has determined you have not met the acceptable performance standards of a probationary officer. Consequently, he has recommended that your employment be terminated. The recommendation to terminate your employment is based on objective facts that demonstrate you have not progressed in your training as required and expected. I concur with the recommendation. Accordingly, your employment as a police officer with the Portland Police Bureau will be terminated at 2359 hours May 22, 2006.

(Babnick Aff. Ex. 25.) Whitley then offered a letter of resignation, effective immediately, in which she explained that she elected to resign to make it easier for her to find work. Whitley then stated that "I believe that I have been discharged in retaliation for complaining about sexually harassing and discriminatory treatment that I received while I was attending the State of Oregon Basic Training Academy; and/or because I suffered and on-the-job injury while at the Academy. (Oldham Decl. Ex. 29.)

B. Proffered Comparators' Training Experience

At least three other officers with performance issues who underwent Reviews during the same time frame as Whitley were not immediately terminated. Two female officers, Jane Doe and Janet Roe, had multiple performance deficiencies but were afforded more opportunities to succeed than Whitley. (Oldham Decl. Under Seal Exs. 1, 9.) Jane Doe had documented deficiencies for ten

months, which included problems with geography and responding to radio calls. (Oldham Decl. Under Seal Ex. 1 at 25-27.) The Bureau gave her multiple opportunities to improve her performance. (Oldham Decl. Under Seal Ex. 1 at 27.) On March 15, 2007, DPSST sent Chief Sizer a post-Review recommendation that Jane Doe be terminated, and Chief Sizer agreed with the recommendation. (Oldham Decl. Under Seal Ex. 1 at 25.) Janet Roe had documented performance deficiencies for four months, which included safety issues and failure to follow Bureau rules and policies. (Oldham Decl. Under Seal Ex. 9 at 9-10.) The Bureau gave Janet Roe multiple opportunities to improve her performance to meet Bureau expectations. (Oldham Decl. Under Seal Ex. 9 at 9-10.) After a Review, DPSST recommended that the City terminate Janet Roe. (Oldham Decl. Under Seal Ex. 9 at 9-10.)

Additionally, a male officer from Whitley's Academy class was subject to a Review sixteen months after Whitley. This officer, John Doe, had multiple performance deficiencies and, while on duty, caused a car accident in which a civilian was injured. (Oldham Decl. Under Seal Ex. 3 at 4-9.) Despite his repeated performance deficiencies, John Doe advanced to Phase I of probationary training on schedule, he advanced to Phase II in ten weeks (which is projected for completion in five weeks), he advanced to Phase III after six weeks, and he advanced to Phase IV after eight weeks (which is projected for completion in five weeks). (Oldham Decl. Under Seal Ex. 3 at 7.) Probationary services recommended a review for John Doe because of the "repetitive nature of the performance concerns, the protracted time in Entry through Phase IV[,]" and doubts as to whether he could "meet the acceptable standard of performance with the Bureau as outlined in the Manual of Policy and Procedures, Standardized Evaluation Guidelines, and the Field Training and Evaluation Program." (Oldham Decl. Under Seal Ex. 3 at 9.)

After John Doe's review, Chief Sizer ordered the training division to extend John Doe's probation by six months and develop corrective strategies to resolve John Doe's deficiencies. (Oldham Decl. Under Seal Ex. 5 at 1.) The Bureau extended John Doe's probation on June 6, 2007. (Oldham Decl. Under Seal Ex. 5 at 7.) On July 23, 2007, officials at DPSST recommended another review for John Doe because, in addition to its earlier concerns, "the potentially adverse outcomes associated with the numerous Officer Safety and Field Performance issues clearly prevent Officer [Doe] from safely working the street with or without a Field Training Officer." (Oldham Decl. Under Seal Ex. 6 at 3.) At the review on August 17, 2007, the Captain of the Training Division, Eric A. Hendricks, noted John Doe's multiple failures to meet performance standards in the areas of "Knowledge of Bureau Rules and Procedures, Knowledge of ORS, Knowledge of Oregon Vehicle Code, Geographic Orientation, Report Writing, Field Performance, Investigative Skill, Self-Initiated Field Activity, Officer Safety and Radio Procedures." (Oldham Decl. Under Seal Ex. 8 at 1.) Hendricks concluded that John Doe "failed to meet the minimum standards of a probationary officer" and thus recommended John Doe's termination. (Oldham Decl. Under Seal Ex. 8 at 1.) The Bureau terminated John Doe on August 27, 2007. (Oldham Decl. Under Seal Ex. 8 at 3.)

At least two other male officers, Tom Long and Frank Roe, were given opportunities to succeed despite poor performances. (Hecht Decl. under Seal ¶¶ 9-10.) Similar to John Doe, these officers had passed the Academy and were in phases 1-5 of training. (Hecht Decl. under Seal ¶¶ 9-10.) The Bureau retained Tom Long through the Academy and then Advanced Academy and allowed him to work the street despite his "multiple issues with supervisors and insubordination." (Hecht Decl. under Seal ¶ 9.). Similarly, the Bureau gave Frank Roe "multiple opportunities to succeed over several months" even though he "seemed to perform poorly on a consistent basis."

(Hecht Decl. ¶ 9.) The Bureau even "moved [Frank Roe] from one coach at one precinct to another precinct because he was not doing well." (Hecht Decl. under Seal ¶ 9.) The Bureau eventually terminated both Tom Long and Frank Roe. (Hecht Decl. under Seal ¶ 8.)

Additionally, there was at least one other probationary male officer who missed an optional training class. (Schilling Dep. 83:20-84:3.) DPSST officials did not request a Review of that officer. (Schilling Dep. 84:2-4.) Officer Schilling explained that they did not request a Review because that officer was sick and made the class up later. (Schilling Dep. 84:5-8.)

C.  Evidence of Like Retaliatory Treatment of Other Members of Whitley's Protected Class

Whitley presents evidence that two other female probationary officers claimed that they were retaliated against by the Bureau after they reported what they believed to be unlawful or discriminatory conduct by other officers. (Lewis Decl. under Seal ¶¶ 6-15; Oldham Decl. Ex. 31.) Whitley's claims for retaliation are not bolstered or supported in any way by the existence of similar claims from other female probationary officers. Her claims will stand on the evidence of the Bureau's treatment of her, not allegations of its treatment of women in general. Accordingly, this evidence is not relevant to Whitley's claims and will not be considered by the court.

### Legal Standard

Summary judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Id.* at 248. The moving party bears the initial burden of showing "the

absence of a genuine issue concerning any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159 (1970). The moving party satisfies its burden by offering the district court the portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir. 1999).

Once the moving party meets its initial burden, the nonmoving party must establish the existence of a genuine issue of material fact. FED. R. CIV. P. 56(e). To meet this burden, the nonmoving party must make an adequate showing as to each element of the claim for which it will bear the burden of proof at trial. *Celotex*, 422 U.S. at 322-23. The nonmoving party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). In order to establish that there is a genuine issue of material fact, the nonmoving party "need only present evidence from which a jury might return a verdict in [the nonmoving party's] favor." *Anderson*, 477 U.S. at 257. The evidence set forth must be sufficient to allow a rational jury to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A "mere scintilla of evidence in support of the [nonmoving party's] position [is] insufficient." *Anderson*, 477 U.S. at 252. Additionally, the court must view the evidence in the light most favorable to the nonmoving party, and must draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).

The Ninth Circuit has cautioned against too readily granting summary judgment in employee

discrimination cases because of "the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81-82 ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, exceptions, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). Thus, the Ninth Circuit has set "a high standard for granting summary judgment in employment discrimination cases." *Schindrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996). Courts require "very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry–one that is more appropriately conducted by the factfinder upon a full record." *Id.* (internal quotations and citation omitted). Additionally, "any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder," and thus "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits." *Id.* (quoting *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir. 1995)).

Nevertheless, the Ninth Circuit holds that the "[f]ailure to allege 'specific facts' that establish the existence of a prima facie case renders a grant of summary judgment appropriate." *Jurado v. Eleven-Fifty Corp.*, 813 F.2d 1406, 1409 (9th Cir. 1987) (citation omitted). Additionally, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimum prima facie case." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890-91 (9th Cir. 1994).

PAGE 16 - FINDINGS AND RECOMMENDATION                              {MEP}

*Discussion*

A.  Federal Gender Discrimination

    1.  Standards

    "To establish a *prima facie* case [of discrimination], a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful discrimination.'" *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  A plaintiff can meet this burden by showing that she has been singled out and treated less favorably than others similarly situated because of a protected class status.  *See McGinest*, 360 F.3d at 1121 (applying standard in race discrimination case).  A plaintiff can establish a *prima facie* case of discrimination in one of two ways.  First, the plaintiff could present direct evidence of discriminatory intent.  *Wallis*, 26 F.3d at 889.  "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Vasquez v. Los Angeles,* 349 F.3d 634, 640 (9th Cir.2003) (quoting *Godwin*, 150 F.3d at 1221).  Second, the plaintiff alternatively could establish that: "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin*, 150 F.3d at 1220 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

    Once a plaintiff establishes her *prima facie* case, the burden shifts to the defendant to "articulate nondiscriminatory reasons for the allegedly discriminatory conduct." *McDonnell Douglas*, 411 U.S. at 802.  If the defendant articulates a "facially nondiscriminatory reason," the burden shifts back to the plaintiff "to show that the employer's reason was a pretext for

discrimination." *Burdine*, 450 U.S. at 252.  Pretext may be established in one of two ways: "(1) indirectly by showing that defendant's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the defendant." *White v. TA Operating Corp.*, No. 06-1747-AA, 2008 WL 2557983, *3-4, 2008 (D. Or. June 19, 2008) (citing *Godwin*, 150 F.3d at 1220). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine,* at 253.

The requisite degree of proof to establish a *prima facie* case for Title VII claims on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis*, 26 F.3d at 889.  Once a plaintiff establishes a *prima facie* case of discrimination, it "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Burdine*, 450 U.S. at 254.  But once the defendant offers a "a legitimate, nondiscriminatory reason for its employment decision, the . . . presumption of unlawful discrimination 'simply drops out of the picture.'" *Wallis*, 26 F.3d at 889 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)).

2. Discussion

Whitley relies on circumstantial evidence to support her gender discrimination claim.  That she meets the first and third prongs of the *McDonnell Douglas* test is not in dispute,[2] and Whitley contends that she "has adduced sufficient evidence to meet the second and fourth prongs" of the test as well.  (Pl.'s Mem. in Opp. 13.)  The City claims that "Whitley cannot prove that she was

---

[2] *See* Defs.' Mem. in Supp. 14 ("the City agrees that Whitley is a female which is a class protected under Title VII.  Whitley also was terminated on May 22, 2006, which is a sufficient adverse action for the third element.").

performing according to the City's legitimate expectations, nor can she prove that there were similarly situated male employees who were treated more favorably than Whitley." (Defs.' Mem. in Supp. 14.)

> a. Whitley cannot show that she was satisfactorily performing her job.

To make her *prima facie* case, Whitley must produce evidence that she was performing according to the Bureau's legitimate expectations. The Ninth Circuit characterizes the crux of this element as whether the plaintiff "adequately" performed her job, which "suggests a standard less than perfect performance." *Moorehead v. Chertoff*, No. C-07-1205-MJP, 2008 WL 4810308, at *2 (W.D. Wash. Nov. 3, 2008) (citing *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1031 (9th Cir. 2006)). The *Moorehead* court reasonably concluded that the "proposition that an employer has a 'legitimate' expectation that an employee will *never* violate a job requirement" is "not a persuasive argument." *Id.* at *2. To prove that she was meeting the employer's legitimate expectations, the employee could offer evidence such as "positive performance reviews, admissions by the employer, or even expert testimony as to an employer's legitimate expectations for the job at issue." *Abram v. San Francisco*, No. C07-3006PJH, 2008 WL 4462104, at *3 (N.D. Cal. Oct. 3, 2008).

The City argues that Whitley did not perform according to the Bureau's legitimate expectations because she "was unable to meet State of Oregon mandated standards required for her to become a certified police officer." (Defs.' Mem. in Supp. 15.) The City points to the facts that DPSST gave Whitley deficiency ratings in qualifying tests for both handgun and shotgun, that Whitley had to rewrite reports that were not up to DPSST standards, that she scored below passing on an exam, and that her final academic ranking was forty-one out of forty-two students. (Defs.'

PAGE 19 - FINDINGS AND RECOMMENDATION                                    {MEP}

Mem. in Supp. 15-16 (citing Defs.' CSMF[3] ¶¶ 9-15).)  Whitley also failed to turn in at least one assignment on time, she was late to class at least once, she missed optional evening classes without following DPSST notification procedures, she did not follow an order to call her supervisor, and "when questioned about these performance issues by DPSST or Bureau employees, Whitley appeared untruthful." (Defs.' Mem. in Supp. 16 (citing Defs.' CSMF ¶¶ 16-40).)

Whitley responds with two arguments:  (1) her testimony "as to the quality of her work can be sufficient, without more, to establish that she performed according to defendant's expectations for purposes of a prima facie case," and (2) her alleged deficiencies were "minor errors" that do "not demonstrate Whitley to be incompetent." (Pl.'s Mem. in Opp. 16-17.)  In support of her first argument, Whitley relies on a case from this district that cited Seventh Circuit precedent that "a plaintiff may establish the satisfactory job performance element of his prima facie case by relying solely upon his affidavit that he subjectively believed that his performance was adequate." *Flemming v. Portland*, No. CV-99-326-ST, 2000 WL 116073, at \*9 (D. Or. Jan. 5, 2000) (citing *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 923 n.1 (7th Cir. 1988) ("A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work.")).

The City counters that a more recent Ninth Circuit case considers a plaintiff's "'self-assessment of his performance [to be] relevant' in satisfying plaintiff's burden of showing qualification at the initial, *prima facie* case, stage of the *McDonnell Douglas* burden-shifting rationale  but has not relied solely on the plaintiff's self serving assessment. " (Defs.' Reply 7)

---

[3]"CSMF" refers to the Concise Statement of Material Facts filed by the referenced party.

PAGE 20 - FINDINGS AND RECOMMENDATION                                    {MEP}

(quoting *Lyons v. England*, 307 F.3d 1092, 1115 (9th Cir. 2002)(internal quotations and citation omitted).) The *Lyons* court noted the plaintiff's self-assessment and then stated, "[w]hile we do not rely on this evidence alone, we note it as relevant in combination with other circumstantial evidence of qualification." *Lyons*, 307 F.3d at 1115. In fact, while a plaintiff's self-assessment is a relevant consideration, by itself it is not evidence sufficient to satisfy this element of a plaintiff's *prima facie* case. *See, e.g., Otsyula v. Or. Dept. Of State Lands*, No. 07-1390-ST, 2008 WL 5246092, *6 (D. Or. Dec. 16, 2008) ("However, 'an employee's subjective personal judgments of [his] competence alone do not raise a genuine issue of material fact.'")(quoting *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996). Therefore, Whitley's self-assessment is relevant to but not determinative of the question of whether she was adequately performing her duties.

On this point, and as the City observes, Whitley has not provided "her subjective assertion nor objective evidence that she was performing as well as her classmates." (Defs.' Reply 8.) Indeed, the City cites Whitley's poor performance, as enumerated above, and that "Whitley herself admits her performance was deficient." (Defs.' Reply 8 (citing Whitley Decl. ¶ 18).) Given the documented performance deficiencies and Whitley's acknowledgment of her deficient Academy performance, Whitley's use of her own assessment here is not useful evidence to support a reasonable inference that her performance met the City's standards.

Whitley's second argument blends with her self-assessment argument: that her alleged deficiencies were "minor errors" that did not "demonstrate [her] to be incompetent." (Pl.'s Mem. in Opp. 16.) Whitley contends that her "only performance deficiencies regarding her training while at [the Academy] were alleged to have occurred between 01/31/06 and 02/10/06." (Pl.'s Mem. in Opp. 16 (citing Whitley Decl. ¶¶ 6-9).) Whitley cites no case law to support the implied premise of

PAGE 21 - FINDINGS AND RECOMMENDATION                              {MEP}

her argument, that deficient performance, if only brief in duration, may be disregarded in considering whether a plaintiff has met this prong of the *McDonnell Douglas* test. Furthermore, Whitley does not contest that successful completion of these qualifications applied to all probationary officers at the Academy or that she was exempted from this requirement. This argument, therefore, also is unavailing on the *prima facie* case.

Whitley also contends that her alleged academic deficiencies "were not serious and, because [she] did complete and pass all of her academic, nonphysical skills, course work, these arguments are irrelevant." (Pl.'s Mem. in Opp. 17.) Although this argument has more merit – DPSST's willingness to pass Whitley's academic course work indicates that she performed adequately in at least one aspect of her job – the fact remains that ultimately she did not meet the Oregon mandated standard to become a police officer and, thus, did not graduate from Basic Academy. (Pl.'s CSMF ¶ 3 (citing OR. REV. STAT. 181.640, 181.655(1)(b)).) Although Whitley argues that many of her alleged deficiencies were attributable to her knee injury, (Pl.'s Mem. in Opp. 17), she overlooks that many of the alleged deficiencies enumerated above, such as handing in assignments late, arriving late to class, failing to follow DPSST notification procedures for missed classes, and appearing untruthful to DPSST officials, were deficiencies not show to be related to her knee injury. As such, Whitley did not perform to her employer's legitimate expectations in all aspects of her performance.

The City has demonstrated that there is no genuine issue of material fact that Whitley did not perform according to the Bureau's legitimate expectations. Whitley did not present any additional evidence that she met her employer's legitimate expectations, nor has she expressly argued that her performance did meet her employer's legitimate expectations. Therefore, Whitley cannot make a *prima facie* case and summary judgment should be granted for the City on Whitley's gender

discrimination claims.

          b. There were no male employees similarly situated to Whitley, and if there were, the employees were not treated more favorably than Whitley.

To meet this element, Whitley must show that "others not in [her] protected class were treated more favorably." *Aragon v. Republic Silver St. Disposal, Inc.*, 292 F.3d 654, 660 (9th Cir. 2002). Specifically, Whitley must present evidence that similarly situated males were treated more favorably. *Id.* This element contains two requirements. First, Whitley must show that other employees "are similarly situated to those employees in all material respects." *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). Second, Whitley must show that similarly situated male employees were treated more favorably. *Aragon*, 292 F.3d at 660. Additionally, in a disparate treatment case, "liability depends on whether the protected trait . . . actually motivated the employer's decision," and thus whether the trait "had a determinative influence on the outcome." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993).

          1) Three of four comparators were not similarly situated to Whitley.

The first task under the fourth prong of Whitley's *prima facie* case is determining what group of people was similarly situated to her. "Individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641; *see also Hargrow v. Fed. Express Corp.*, No. 03-0642-PHX-DGC, 2006 WL 269958, **4-5 (D. Ariz. Feb. 2, 2006) ("To be similarly situated, coworkers must have been dealt with by the same supervisor, subject to the same standards, and engaged in similar conduct." (citing *Vasquez*, 349 F.3d at 641)). The Ninth Circuit adopted this rule from the Eighth Circuit, which holds that "[e]mployees are similarly situated when they are involved in or accused of the *same offense* and are disciplined in different ways." *Ward v. Proctor & Gamble Paper Prods. Co.*, 111 F.3d 558, 560 (8th Cir. 1997) (internal quotations and citation

PAGE 23 - FINDINGS AND RECOMMENDATION                {MEP}

omitted, emphasis in original). In *Vasquez*, the Ninth Circuit held that the plaintiff was not similarly situated to other employees because, even though the employees "held the same level position," they "did not engage in problematic conduct of comparable seriousness to that of [the plaintiff]." 349 F.3d at 641. Therefore, under *Vasquez*, employees similarly situated to Whitley must have "similar jobs" and must have engaged in "problematic conduct of comparable seriousness."

The City argues that a similarly situated group would be made up of individuals with Whitley's performance deficiencies. (Defs.' Mem. in Supp. 18.) Whitley, on the other hand, argues that those "similarly situated" are "[o]ther officers who have gone through the PPB probationary review process." (Pl.'s Mem. in Opp. 19.) Under Ninth Circuit precedent, the City's view is correct: the employee-comparators must have engaged in problematic conduct of comparable seriousness.

Whitley makes two arguments regarding similarly situated male employees. First, she argues that three similarly situated male employees were treated more favorably: Frank Roe, Tom Long, and John Doe. All of these men passed the Academy and were in phases 1-5 of training, and they were all terminated from the Bureau. Frank Roe "was given multiple opportunities to succeed over several months," he was "moved from one coach at one precinct to another precinct because he was not doing well" and "seemed to perform poorly on a consistent basis." (Hecht Decl. under Seal ¶ 8.) Nevertheless, the Bureau "gave him opportunities to succeed after Basic Academy and after Advanced Academy." (Hecht Decl. under Seal ¶ 8.) Without additional information, the evidence regarding Frank Roe does not show that he was similarly situated to Whitley because his specific performance deficiencies are unknown. Similarly, Whitley argues that "despite his multiple issues with supervisors and insubordination," Tom Long "was retained through Basic Academy, through Advance [sic] Academy and ultimately worked the street before he was finally terminated." (Hecht

PAGE 24 - FINDINGS AND RECOMMENDATION                                    {MEP}

Decl. under Seal ¶ 9.) Again, this statement does not support the conclusion that Whitley was similarly situated to Tom Long because his specific performance deficiencies remain unknown.

Whitley also contends that John Doe is a similarly situated male employee. (*See* Pl.'s Mem. in Opp. 20.) John Doe, who went though the Academy with Whitley, later had "major performance deficiencies," including "recklessly causing a car accident while on duty and subsequently injuring a civilian." (Pl.'s Mem. in Opp. 21 (citing Oldham Decl. Under Seal Exs. 3-8).) The Bureau retained John Doe despite his alleged deficiencies and the traffic accident. (Oldham Decl. Under Seal Ex. 5.) Viewing the evidence in the light most favorable to Whitley, the court finds that John Doe could be viewed as similarly situated, or comparable, to Whitley.

In her second argument, Whitley contends that another male officer in the Academy was similarly situated. Like Whitley, this officer "missed an optional class." (Pl.'s Mem. in Opp. 20.) But, unlike Whitley, this officer's absence did not "result in discipline . . . because [he] asserted that he was 'sick' and this was viewed as a reasonable excuse." (Pl.'s Mem. in Opp. 20 (citing Schilling Dep. 83:20-84:10).) This argument does not support the conclusion that Whitley was similarly situated to this officer because the officer's specific performance deficiencies remain unknown, and one instance of another officer's misconduct does not prove that the officer was similarly situated because it does not show that the officer engaged in "problematic conduct of comparable seriousness." *See Vasquez*, 349 F.3d at 641.

> 2) Even if there were other similarly situated male employees, they were not treated more favorably than Whitley.

Whitley argues that she was treated differently from similarly situated male employees because she was "never permitted to undergo a process of documented remediation" unlike other probationary officers who were permitted to undergo such a process before being terminated. (Pl.'s

PAGE 25 - FINDINGS AND RECOMMENDATION                                    {MEP}

Mem. in Opp. 14-15.) Whitley contends that Frank Roe, Tom Long, and John Doe were treated more favorably because they received daily observation reports prior to their terminations. The City correctly responds that this is not evidence of more favorable treatment because "Whitley has produced no evidence that any males at Basic Academy . . . received daily observation reports," but she did present evidence "that males and females who advanced to phases 1-5 of training received daily observation reports." (Defs.' Reply 10.) Whitley did not graduate from the Academy and never began Phase 1 training. (Whitley Dep. 82:1-6.) Therefore, there is no evidence that she was entitled to receive daily observation reports at the Academy or that the male officers' receipt of such reports was favorable treatment.

In conclusion, Whitley has failed to present a genuine issue of material fact with regard to her claim for gender discrimination under Title VII. Specifically, Whitley has failed to present evidence that she was performing according to the Bureau's legitimate expectation or that similarly situated male employees were treated more favorably. Therefore, the City's motion for summary judgment on Whitley's federal gender discrimination claim should be granted.

B. State Gender Discrimination

"The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used under federal law." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Even though Title VII's *prima facie* analysis applies to the state claims, Oregon has rejected the *McDonnell Douglas* burden-shifting scheme. *See Callan v. Confederation of Or. Sch. Adm'rs.*, 79 Or. App. 73, 76 (1986) ("the same shifting burden mechanism [that] applies in actions under the Oregon anti-discrimination statutes . . . [was] rejected" by the Oregon Supreme Court) (citing *Portland v. Bureau of Labor and Indus.*, 298 Or. 104 (1984)). In this case, the *McDonnell*

*Douglas* burden-shifting does not apply. As another judge of this district recently explained in *Adams*

*v. Home Depot USA, Inc.*, No. 05-1798-ST, 2007 WL 4565163, at *16-17 (D. Or. Dec. 19, 2007):

> Oregon law prohibiting race and age discrimination (ORS 659A.030) does not follow the *McDonnell Douglas* burden shifting formula even when the claims are premised on circumstantial, rather than direct, evidence of discrimination. *Callan v. Confed. of Ore. Sch. Admin.,* 79 Or. App. 73, 78 n.3, 717 P.2d 1252, 1254 n.3 (1986). Oregon courts have, however, acknowledged that the requirements for a *prima facie* case of discrimination based on circumstantial evidence under federal law also apply to state law claims. *See Henderson v. Jantzen,* 79 Or. App. 654, 658, 719 P.2d 1322, 1324, *rev denied,* 302 Or. 35, 726 P.2d 934 (1986), citing *Burdine,* 450 U.S. at 253. In other words, a plaintiff who establishes a *prima facie* case of discrimination under Title VII or ADEA survives summary judgment on the corresponding discrimination claim under ORS 659A.030 without having to satisfy the next steps of the *McDonnell Douglas* framework.
>
> Nevertheless, based on *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1091 (9th Cir. 2001), Home Depot contends that the *McDonnell-Douglas* burden shifting applies here to plaintiffs' Oregon employment discrimination claims. *Snead* holds that federal courts with diversity jurisdiction must apply the *McDonnell Douglas* burden-shifting framework to claims under ORS 659A.030. This court has previously found *Snead* inapplicable to state discrimination claims premised on supplemental jurisdiction. *See Pascoe v. Mentor Graphics Corp.,* 199 F. Supp. 2d 1034, 1052 n.4 (D. Or. 2001). Citing *Echols v. Lokan & Assoc., Inc.,* 2007 WL 756691 * 10 (D. Or. March 7, 2007), Home Depot argues that the burden-shifting framework applies to state claims regardless of whether jurisdiction is governed by diversity or federal question. However, *Echols* simply held that because the plaintiff satisfied her *prima facie* case under Title VII, she also met her *prima facie* case under ORS 659A.030 and denied summary judgment to employer on the state claim.

Here, because Whitley cannot make a *prima facie* case under her Title VII gender

discrimination claim, she cannot make a case under state law. Therefore, the City has met its burden

on Whitley's state discrimination claim, and its motion for summary judgment should be granted.

C.  Federal Retaliation

    1. Standards

An employer can violate the anti-retaliation provisions of Title VII in either of two ways: "(1)

if the [adverse employment action] occurs because of the employee's opposition to conduct made an

unlawful employment practice . . . , or (2) if it is in retaliation for the employee's participation in the machinery set up by Title VII to enforce its provisions." *Hasimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (internal quotations and citation omitted). The former is referred to as the "opposition clause," and the latter is called "the participation clause." *Id.* Whitley argues that the City violated the opposition clause, not the participation clause, by firing her for reporting and opposing gender discrimination. (Pl.'s Mem. in Opp. 34.)

The *prima facie* elements for a retaliation claim under Title VII are: (1) the plaintiff was engaged in a protected activity; (2) the plaintiff was thereafter subjected by his employer to an adverse employment action; and (3) there is a causal link between the protected activity and the adverse employment action. *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003); *Wallis*, 26 F.3d at 891. An employee's informal complaints to a supervisor of an allegedly discriminatory incident are a protected activity and thus satisfy the first element. *Passantino v. Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000). Although the elements for a retaliation claim are different from a gender discrimination claim, the *McDonnell Douglas* framework has been adapted to both claims, and the burden-shifting scheme is the same. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). Thus, if the employee establishes a *prima facie* case of retaliation, the employer may rebut it by producing "evidence sufficient to dispel the inference of retaliation raised by the plaintiff." *Cohen v. Fred Meyer, Inc.*, 686 F.3d 793, 796 (9th Cir. 1982). The burden then shifts to the employee to produce evidence that the employer's proffered reasons are pretextual. *Burdine*, 450 U.S. at 256.

2. Discussion

The City's motion challenges the first and third elements of Whitley's *prima facie* retaliation

PAGE 28 - FINDINGS AND RECOMMENDATION                                      {MEP}

case.[4] Genuine issues of material fact exist with regard to whether Whitley engaged in a protected activity and whether there is a causal link between the protected activity and her termination from the Bureau.

> a. There are genuine issues of material fact whether Whitley reasonably believed that she was reporting unlawful conduct.

To meet the first element of her *prima facie* case, Whitley must prove that she had "a reasonable belief that the employer has engaged in an unlawful employment practice." *Moyo* v. *Gomez*, 40 F.3d 982, 984 (9th Cir. 1994). The employment practice need not actually be unlawful because "opposition clause protection will be accorded 'whenever the opposition is based on a *"reasonable belief"* that the employer has engaged in an unlawful employment practice.'" *Id.* (emphasis in original)(quoting *EEOC v. Crown Zellerbach Corp.*, 720 F.3d 1008, 1013 (9th Cir. 1983)); *see also Strother v. S. Cal. Permanente Med. Group.*, 79 F.3d 859, 868 (9th Cir. 1996) ("even if [the plaintiff] cannot bring a . . . *discrimination* claim, she can still assert a . . . *retaliation* claim if she had a 'reasonable belief' that she had a legitimate . . . claim . . . .") (emphasis in original). The reasonableness of an employee's belief that the employer committed an unlawful employment practice "must be assessed according to an objective standard – one that makes due allowance . . . for the limited knowledge possessed by most Title VII plaintiffs about the factual and legal bases of their claims." *Moyo*, 40 F.3d at 985. Thus, an erroneous belief that the employer engaged in an unlawful employment practice is actionable "if [it is] premised on a mistake made in good faith," which may either be a mistake "of fact or of law." *Id.* at 984. The Ninth Circuit finds instructive whether the plaintiff's report or complaint was "brought in bad faith or meant to harass [the defendant]." *Strother,*

---

[4] The parties do not dispute that Whitley's termination from the Bureau was an adverse employment action, which satisfies the second element of the prima facie case for retaliation.

PAGE 29 - FINDINGS AND RECOMMENDATION                    {MEP}

79 F.3d at 869. Additionally, courts must construe Title VII broadly, and this directive also applies to "the reasonableness of a plaintiff's belief that a violation occurred." *Id.* at 985.

Whitley argues that she engaged in a protected activity by "reporting and opposing gender discrimination and retaliation." (Pl.'s Mem. in Opp. 34.) Whitley contends that she did so by reporting her February 1 conversation with Lt. Rau to Officer Schilling the next day. (Defs.' Mem. in Supp. 24 (citing Defs.' CSMF ¶¶ 67, 50).) The City makes two arguments to support its assertion that Whitley could not have reasonably believed that she was reporting a violation of Title VII. (Defs.' Mem. in Supp. 23.) First, it argues that Whitley could not have believed that she made a complaint of discrimination, and second, it argues that if she did make such a complaint, she could not have objectively and reasonably believed that she was complaining about her employer's unlawful activity.

In its first argument, the City notes the undisputed fact that Whitley stated that the reason she told the Bureau about Lt. Rau's statements "was not to make a complaint." (Whitley Dep. 107:3-6.) Whitley also told the Bureau that she was "okay with everything," that she "felt fine now," and she was "fine with it." (Day Aff. Ex. 28 at 2.) The City points out that "[t]hose words do not indicate that Whitley was making a complaint of discrimination" (Defs.' Reply 28), but this argument ignores the fact an employee need not make a *complaint* in order to be protected from retaliation; rather, the employee need only *oppose* what he or she reasonably believed to be an unlawful employment action. *See Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) ("An employer can violation the anti-retaliation provisions of Title VII . . . if the [adverse employment action] occurs because of the employee's opposition to conduct made unlawful by the subchapter, . . ."). A reasonable jury could conclude that Whitley opposed Lt. Rau's statements by reporting the incident to Officer Schilling and

then speaking with Sgt. Day and Lt. Rau about it, even if she later stated that she was "fine with it."

To support its second argument, the City cites a Supreme Court case in which the Court found that no reasonable person could have believed that the particular "single incident" in that case violated Title VII's standard. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). The Court held that the isolated incident could not "remotely be considered extremely serious, as our cases require." *Id.* Under this precedent, the Ninth Circuit found an employee's report of a single incident of rape to be serious enough to warrant an employee's objectively reasonable belief that she was reporting an unlawful employment practice. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002). The City argues that the single incident of Lt. Rau's statement did not allow Whitley to objectively and reasonably believe that she was reporting sexual harassment. (Defs.' Mem. in Supp. 24-25.)

This argument fails because, even in instances in which a claim is based on a single incident of harassment, "the test in the Ninth Circuit is whether the complaining party has an objectively 'reasonable belief,' with 'due allowance' given for lack of legal knowledge . . . ." *Figueroa v. Paychex, Inc.*, No. 99-797-ST, 1999 WL 717349, at *11 (D. Or. Sept. 7, 1999). The City's argument, taken literally, would require a plaintiff either to undergo an extremely serious incident, such as rape, or to possess knowledge of the legal standard for discrimination or harassment in order to maintain a retaliation claim. Additionally, the imposition of a bright-line rule that employees must undergo either a sufficiently serious single incident or possess legal certainty that conduct violates Title VII before qualifying for protection from retaliation would run directly contrary to the well-established rule that an employee who in good faith reports discrimination or harassment is protected from retaliation even if a subsequent investigation revealed no unlawful employment action had occurred.

*See Figueroa*, 1999 WL 717349, at *11 (Noting that the reasonable belief test "closely follows the reasonable victim standard employed in other areas of employment discrimination.").

A reasonable jury could find that Whitley had an objectively reasonable belief that she was reporting sexual harassment under the Ninth Circuit's standard. The February 1 discussion focused on Whitley's breasts and their appearance. Whitley reported the incident to Officer Schilling on February 2, 2006, and told Sgt. Day that Lt. Rau's comments "shouldn't have been said" and expressed her concern that she "[didn't] want to feel singled out." Additionally, the City presented no evidence that Whitley made the claims in bad faith or to harass the City or Sgt. Day. Therefore, Whitley has created a genuine issue of material fact that she reasonably believed she was reporting gender-based discrimination or harassment.

      b.  There is a genuine issue of material fact whether there is a causal link between a protected activity and Whitley's termination.

To prove a causal link between the allegedly protected activity and the adverse employment action, an employee "must show by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [the adverse employment action] and that but for such activity [the employee] would not have been fired." *Ruggles v. Cal. Polytechnic St. Univ.*, 797 F.2d 782, 785 (9th Cir. 1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002). That an employer's actions were caused by an employee's engagement in protected activities may be inferred from "proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003) ("Temporal proximity between protected activity and an adverse employment action can by itself constitute sufficient circumstantial evidence of retaliation in some cases."). The employer, however, must be aware of the employee's protected activity. *See,*

PAGE 32 - FINDINGS AND RECOMMENDATION                            {MEP}

e.g., *Cohen v. Fred Meyer*, 686 F.3d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity."); *Lawson v. Walgreen Co.*, 07-1884-AC, 2009 WL 742680, at *12 (D. Or. March 20, 2009) ("The causal link between a protected activity and the alleged retaliatory action 'can be inferred from timing alone' when there is a close proximity between the two, but there must also be evidence that the employer was aware of the employee's protected activity.") (citations omitted). However, employers are not required to stop a previously planned adverse employment action "upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality." *Breeden*, 532 U.S. at 272.

The parties' arguments focus on two issues: (1) the timing of Whitley's reported performance deficiencies as compared to the timing of her engagement in the protected activity, and (2) the fact that Chief Sizer was unaware of Whitley's engagement in a protected activity. In the first argument, the City contends that Whitley did not engage in the protected activity of reporting alleged sexual discrimination until *after* the Bureau raised her performance issues on February 9, 2006. (Defs.' Reply 28.) Thus, the City argues, it simply "proceeded along lines previously contemplated, though not yet definitely determined." (Defs.' Mem. in Supp. 27-28.) The City also points out that Whitley did not use the phrase "sexual harassment" until February 10, and contends that Whitley therefore did not actually engage in protected activity until then. (Defs.' Reply 28.)

The City's timing argument is flawed because it relies on the wrong date. Whitley correctly points out that she engaged in the protected activity on February 2, 2006, by reporting her conversation with Lt. Rau to Officer Schilling, seven days before the Bureau first confronted her with alleged performance deficiencies. (Pl.'s Mem. in Opp. 35 (citing Pl.'s CSMF ¶ 77).) Although

PAGE 33 - FINDINGS AND RECOMMENDATION                              {MEP}

DPSST officials asserted that these deficiencies began on January 31, 2006, aside from Whitley's poor firearms qualifications scores, the City produced no evidence that DPSST officials documented any of Whitley's alleged performance deficiencies prior to her February 2, 2006, report of Lt. Rau's statements to Officer Schilling. Not until nine days after after Whitley's February 2 report did the City create documentation of her alleged performance deficiencies. Given the Ninth Circuit's clear standard for applying temporal proximity analysis to retaliation claims and its emphasis on the employer's knowledge of a plaintiff's protected activity, a question of fact exists whether the City retaliated against Whitley for engaging in a protected activity.

In its second argument, the City correctly notes that "Whitley admits that Sizer was not aware of Whitley's complaint regarding Lt. Rau," and that only Chief Sizer had the authority to terminate a probationary police officer. (Defs.' Reply 30 (citing Defs.' CSMF ¶¶ 59, 65-66).) But the analysis does not end with Chief Sizer's lack of knowledge if her decision was influenced by persons who held discriminatory animus toward Whitley. (Pl.'s Mem. in Opp. 17-18.) Specifically, Whitley argues that even if Chief Sizer were unaware of her complaint to Lt. Rau, the Chief's decision nevertheless was tainted because if "one with discriminatory animus infects a decision, that decision will be illegal even though the employee with animus does not have the ultimate decision making power." (Pl.'s Mem. in Opp. 17) (citing *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (9th Cir. 1994).

Whitley's argument is well supported by Ninth Circuit precedent. For example, the court in *Bergene* held that the "retaliatory motive" of the a plaintiff's supervisor, who gave the ultimate decision maker an assessment of the plaintiff's performance, "may be imputed to the company if [he]

was involved in the [adverse employment action]." 272 F.3d at 1141. Similarly, in *Dominguez-Curry v. Nevada Transportation Department*, 424 F.3d 1027, 1039-40 (9th Cir. 2005), the Ninth Circuit held that where "the person who exhibited discriminatory animus influenced or participated in the decision-making process, a reasonable fact finder could conclude that the animus affected the employment decision."

Applying the *Bergene* and *Dominguez-Curry* precedents to the facts here, there is a genuine issue of fact whether Lt. Rau and other DPSST officials infected the employment decision with their discriminatory animus. A reasonable jury could conclude that Lt. Rau's memo about Whitley's alleged deficiencies, which prompted Whitley's Review and ultimately led to her termination, tainted Chief Sizer's ultimate decision to terminate. Although Chief Sizer noted that her decision to terminate Whitley was based on "objective facts that demonstrate [Whitley has] not progressed in [her] training as required and expected," (Babnick Aff. Ex. 25), she relied for those objective facts on Captain Babnick and his recommendation, which was based on evidence compiled by Lt. Rau and DPSST officials. (*See* Babnick Aff. Ex. 25 (explaining that Chief Sizer agreed with Captain Babnick's recommendation of termination).) Indeed, Captain Babnick's letter to Chief Sizer recommending Whitley's termination outlines numerous occasions when DPSST officials believed that Whitley did not follow Bureau or DPSST rules. (Babnick Aff. Ex. 3 at 1-2.) Therefore, there is a genuine issue of fact whether Chief Sizer's termination decision was tainted by DPSST officials' discriminatory animus toward Whitley. In conclusion, the City has not met its initial burden of showing an absence of a genuine issue of material fact regarding the existence of a causal link between Whitley's report of Lt. Rau's statements and her termination from the Bureau. Because there are genuine issues of material fact whether Whitley reasonably believed she was engaging in a

protected activity and whether there was a causal connection between her protected activity and her termination, Whitley has met her prima facie case, and the burden of proof shifts to the City to show legitimate, nondiscriminatory reasons for Whitley's termination.

c. The City has legitimate nondiscriminatory reasons for Whitley's termination.

If the plaintiff establishes a *prima facie* case, "the burden of production – but not persuasion – then shifts to the employer to articulate some legitimate, non-discriminatory reason for the challenged action." *Villiarimo*, 281 F.3d at 1062 (citing *McDonnell Douglas*, 411 U.S. at 802)). Importantly, "[t]he district court must not substitute its own judgment about whether the employment decisions were wise, or even fair, for that of the employer." *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 602 (9th Cir. 1993). The City may rebut Whitley's *prima facie* case by articulating a "legitimate, non-retaliatory reason for the adverse action." *Cohen*, 696 F.3d at 796.

The City offers four examples that Whitley's performance at DPSST was not adequate and that these deficiencies were significant enough to recommend a Review. (Defs.' Mem. in Supp. 19.) First, the City notes that "Whitley signed up for Radar 1 and Radar 2 classes, but did not attend either, nor notify anyone that she would not be attending." (Defs.' Mem. in Supp. 19.) Whitley also failed to attend a Lidar class and did not notify anyone of her absence. (Defs.' Mem. in Supp. 20 (citing Defs.' CSMF ¶¶ 31-33).) Whitley was aware that her failure to notify a training officer of inability to attend a class was against the Academy's policy. (Defs.' Mem. in Supp. 19-20 (citing Defs.' CSMF ¶ 27).) Second, Whitley was late to class and told the instructors, Trooper Snook and Sergeant Plummer, that she was late because she was on the phone with Sgt. Day. (Defs.' Mem. in Supp. 19-20 (citing Defs.' CSMF ¶ 24).) Sgt. Day denied speaking with Whitley that day (Defs.' Mem. in Supp. 19-20 (citing Defs.' CSMF ¶ 25)), which implicates the City's concern about

Whitley's truthfulness.  Third, Whitley did not follow Sgt. Day's order to call him as soon as she received her disability in the line of duty paperwork (Defs.' Mem. in Supp. 20 (citing Defs.' CSMF ¶ 42)), nor did Whitley complete the paperwork as ordered by Sgt. Day.  (Defs.' Mem. in Supp. 20 (citing Defs.' CSMF ¶¶ 42, 46).)  Fourth, at Whitley's Review, "some statements made by Officer Whitley [were] directly contradicted by others and indicate a pattern of untruthfulness."  (Babnick Aff. Ex. 3 at 3.)  Therefore, the City has met its burden of production that it had legitimate reasons for firing Whitley.

> d. There are genuine issues of material fact whether the City's proffered reasons are pretextual.

If a defendant articulates legitimate reasons for its employment decision, the burden shifts back to the plaintiff to show that the defendant's reasons were pretextual. *Burdine*, 450 U.S. at 254. "[T]he plaintiff can prove pretext either (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lyons v. England*, 307 F.3d at 1113. Circumstantial evidence of pretext must be "specific and substantial in order to survive summary judgment." *Id.* (citation omitted). "[W]hen evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal prima facie case based on a *McDonnell Douglas* type presumption." *Wallis*, 26 F.3d at 890-91. But a disparate treatment plaintiff "can survive summary judgment without producing any evidence of discrimination beyond that constituting [her] prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons." *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (citing

{MEP}

*Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133 (2000)).

The City argues that "there is no evidence that the City's reasons for the Whitley's [sic] discharge are a pretext for discrimination and therefore the City is entitled to summary judgment." (Defs.' Mem. in Supp. 22.) Whitley responds with the arguments outlined below. Before addressing Whitley arguments, the court must addresses separately the City's reliance on Whitley's alleged untruthfulness as grounds for her termination.

Whitley's honesty was not raised as an issue by Officer Schilling in his memorandum requesting a Review. Apparently, Whitley's truthfulness became an issue during the Review process and was noted by Captain Babnick in his memorandum to Chief Sizer. However, it is clear from both the language and the structure of Captain Babnick's memorandum that his termination recommendation was based on Whitley's performance deficiencies during late January and early February 2006; not on her untruthfulness. Captain Babnick recommended, after summarizing Whitley's performance deficiencies, that "Whitley be terminated from the Portland Police Bureau for failure to meet performance standards." (Babnick Aff. Ex. 3 at 3.)  After making this recommendation, Babnick commented that Whitley's honesty became a concern during her Review but admitted that the contradictions between Whitley's statements and those of other officers "may not conclusively prove deliberate untruthfulness . . . but are very troubling." (Babnick Aff. Ex. 3 at 3.) In her letter advising Whitley that she was terminated, Chief Sizer referred to Captain Babnick's recommendation that Whitley be terminated for failing to meet the "acceptable performance standards of a probationary officer," noted that the recommendation was based on "objective facts that demonstrate [Whitley had] not progressed in [her] training and required and expected," and then concurred in the recommendation. (Babnick Aff. Ex. 25.) Chief Sizer did not mention the allegations

and evidence of Whitley's untruthfulness.

The City's assertion that the decision to terminate Whitley was based, in part, on her untruthfulness is not supported by the evidence the City cites to support its argument. The City's current reliance on Whitley's untruthfulness as a legitimate, nondiscriminatory reason for Whitley's termination is suspect, raises questions about the other legitimate, nondiscriminatory reasons for Whitley's termination, and creates an issue of fact with regard to the City's true reason from terminating Whitley. As such, the City's reliance on Whitley's untruthfulness at this stage is evidence that the legitimate, nondiscriminatory reasons for Whitley's termination are pretextual.

Similarly, the City's assertion at oral argument that Whitley's failure at both handgun and shotgun firearms training was a legitimate, nondiscriminatory reason for Whitley's termination is evidence of pretext. This performance deficiency was not mentioned in either Officer Schilling or Captain Babnick's memorandum. In fact, Lt. Rau indicated that Whitley's poor performance at firearms training was not an issue. The fact that the City offered this as a reason for Whitley's termination is also evidence of pretext.

Even assuming that Whitley's untruthfulness was a reason for Whitley's termination from the Bureau, Whitley has presented evidence that the City's reasons for terminating her were pretextual. As discussed below, Whitley's argument that Lt. Rau and DPSST officials tainted the information on which Asst. Chief Elmore and Chief Sizer relied when deciding to terminate Whitley creates a genuine issue of material fact whether the City's proffered reasons for termination were pretextual.

    1)  The City's proffered reasons are not pretextual if the City believed them to be true.

Whitley argues that the City's conclusion that she was untruthful was unsubstantiated because

Asst. Chief Elmore reviewed the evidence of Whitley's alleged untruthfulness and "was unable to find a pattern of untruthfulness." (Pl.'s Mem. in Opp. 23 (citing Oldham Decl. Ex. 7).) But the inquiry is not whether Whitley's statements *were* untruthful; it is whether the City *believed them to be* untruthful. *See Odima*, 991 F.2d at 602 (explaining that courts "only require that an employer honestly believed its reason for its actions, even its reason is 'foolish or trivial or even baseless.'" (citation omitted)). As long as the City believed that Whitley lied, its termination of Whitley for untruthfulness is not pretextual. *See id.* ("In judging whether [the employer's] proffered justifications were 'false,' it is not important whether they were objectively false (*e.g.*, whether [the employee] actually lied)."). Therefore, Elmore's inability to find a "pattern of untruthfulness" is irrelevant because it does not speak to the subjective belief of the City regarding Whitley's truthfulness.

> 2) The court should focus on Whitley's failure to notify authorities of her absence, not on her actual absence, from optional training classes.

Whitley argues that the City's proffered reasons are pretextual because other officers described missing the optional training classes as "not being incredibly significant." (Pl.'s Mem. in Opp. 24.) This argument is unavailing because the City was concerned *both* that Whitley missed the classes *and* that she did not notify the proper officials of her absence. (Defs.' CSMF ¶¶ 27-33.) Therefore, while it may true that the optional classes themselves were not "significant," the fact remains that Whitley did not notify anyone of her impending absence, contrary to DPSST policy. Whitley adds that the Bureau's position on the optional classes was a violation of the Fair Labor Standards Act ("FLSA"), and thus the Court should "disregard all of the City's arguments that pertain to these classes." (Pl.'s Mem. in Opp. 24-25 (citing *Haszard v. Am. Med. Response Nw., Inc.*, 237 F.Supp.2d 151, (D.Or. 2001); *Fowler v. Incor*, 279 Fed. Appx. 590 (10th Cir. 2008)).) The FLSA argument ignores the

City's assertion that Whitley violated DPSST policy because she did not *notify* Lt. Rau or Officer Shilling of her absence. (Defs.' CSMF ¶¶ 27-33.) Therefore, the court should not ignore the City's arguments about the missed classes because they are evidence of Whitley's failure to comply with DPSST notification policies.

> 3)  The City may rely on its subjective belief in determining whether Whitley was untruthful.

Whitley argues that the City's proffered reasons were pretextual because the City relied on its subjective beliefs in determining that Whitley was untruthful. (Pl.'s Mem. in Opp. 26.) Thus, Whitley concludes, the "'subjective criteria' are suspect, and their use entitles her to an inference of intent to discriminate." (Defs.' Reply 20.) In support of her argument, Whitley cites to the Ninth Circuit case *Jauregui v. Glendale*, in which the court held that "subjective practices may well be a covert means to effectuate intentional discrimination . . . but they can also be engendered by a totally benign purpose, or carried on as a matter of routine adherence to past practices." 852 F.2d 1128, 1135 (9th Cir. 1988) (citation omitted, alteration in original). The court continued that "[i]f, in fact, the subjective practices are a 'covert means' to discriminate intentionally, by definition intent will be difficult to prove." *Id.* Additionally, "subjective practices are particularly susceptible to discriminatory abuse and should be closely scrutinized." *Id.* (internal quotations and citation omitted).

But, in 2002, the Ninth Circuit clearly held that an employer's reliance on its subjective belief is not pretextual. *Villiarimo*, 281 F.3d at 1063 ("in judging whether [an employer's] proffered justifications were 'false,' it is not important whether they were *objectively false*" because "courts only require than an employer honestly believe its reasons for its actions, even if its reason is foolish

or trivial or even baseless.")(citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (9th Cir. 2001)

(emphasis in original)).  The Ninth Circuit borrowed this rule from the Seventh Circuit case of

*Johnson v. Nordstrom, Inc.*, which borrowed its rule from *McCoy v. WGN Cont'l Broad. Co.*, 957

F.2d 368 (9th Cir. 1992).  The *McCoy* plaintiff argued that his employer's proffered reasons for the

adverse employment action were pretextual, and therefore the court's inquiry was "whether the

[employer's] offered reasons for [the adverse employment actions] are genuinely open to attack at

trial on the ground that they allow an inference of age discrimination." *Id.*  The court held that the

issue did not need to go to trial because:

> it is undisputed that [the employer] had some level of concern with [the employee's]
> performance and had warned him of a possible [adverse employment action].
> Whether or not that level of concern was justified given [the employee's] actual
> performance is irrelevant.  Even if the performance concern was a complete mistake
> . . . so long as [the employer] honestly believed [it] was not, its business judgment will
> not be second-guessed by federal courts . . . .

*Id.*  Similar to the present case, it is undisputed that the City "had some level of concern" with

Whitley's performance, and thus the City's reliance on its subjective belief–even if its belief was

foolish, trivial, or baseless–is not necessarily pretextual.

Therefore, Whitley did not create a genuine issue that the City subjectively believed *at the

time of the Review* that Whitley was untruthful.  Whitley's evidence that she was actually telling the

truth is not relevant to the question of whether the City believed her to be untruthful, and thus the

City's reliance on its subjective belief in terminating Whitley does not bar summary judgment.

> 4)  There is a genuine issue of material fact whether Assistant Chief Elmore
> and Chief Sizer's reliance on DPSST officials' opinions shows that the City's
> proffered reasons were pretextual.

Whitley argues that the City's proffered reasons for her termination were pretextual because,

although Asst. Chief Elmore did not find any instances of untruthfulness in Captain Babnick's memo, she nevertheless relied on DPSST officials' determinations when she recommended Whitley's termination to Chief Sizer. (Pl.'s Mem. in Opp. 27.)  Whitley contends that the representations on which Elmore relied were "tainted by information by Rau and Day." (Pl.'s Mem. in Opp. 27.)  Thus, both Asst. Chief Elmore and Chief Sizer relied on information and representations compiled by DPSST officials, including Lt. Rau, that may have been tainted by discriminatory animus. *See supra* Section C(2)(b).  This creates a genuine issue of material fact whether the City's proffered explanation is "worthy of credence" because a reasonable jury could conclude that the City's explanation is not believable if based on information from the people involved in Whitley's reporting of alleged sexual harassment.

> 5)  The Training Division's non-unanimous decision to terminate Whitley does not transform the reason for Whitley's termination into a question of fact.

Whitley argues that the reasons for her termination are a question of fact because one of the four officers involved Whitley's Review, Lt. Famous, did not vote to terminate her.  Whitley provides no legal support for the assertion that this fact demonstrates that the City's proffered reasons for her termination are pretext.

> 6)  Whitley was not treated less favorably than other officers who went through reviews.

Whitley argues that three officers who went through Reviews were treated more favorably because, unlike Whitley, they were given multiple opportunities to improve even though they had more serious performance deficiencies.  (Pl.'s Mem. in Opp. 29.)  Jane Doe had performance deficiencies with geography and responding to radio calls.  (Pl.'s Mem. in Opp. 29.)  Janet Roe's performance deficiencies included officer safety issues concerning use of force and failing to follow

Bureau policies and directives. (Pl.'s Mem. in Opp. 29.) John Doe "[had] the more serious of any performance deficiencies," and he caused a traffic accident that injured a civilian. Pl.'s Mem. in Opp. 29.) Whitley argues that her deficiencies are "the most minor" of all the officers, and therefore "it is clear that [she] was not given an opportunity to improve commensurate with those of other PPB probationary employees." (Pl.'s Mem. in Opp. 29.)

Evidence could support the conclusion that Whitley's *performance issues* were the "most minor." But Whitley ignores the fact that, unlike the other three officers whose performance deficiencies occurred later in their training and after they graduated from the Academy, Whitley's performance issues occurred at the Academy while she was still a probationary employee and subject to different standards. Additionally, if the court assumes that the Bureau was concerned not only with performance deficiencies but also with untruthfulness, Whitley's situation is distinguishable from that of the other officers on this ground as well. These distinguishing characteristics would justify City officials', namely Chief Sizer's, different treatment of Whitley after the Review. Therefore, the City's different treatment of Whitley does not create a genuine issue of material fact whether the City's proffered reasons for termination were pretextual.

In conclusion, a reasonable jury could find that Whitley has presented sufficient evidence to support a *prima facie* claim of retaliation. She complained about what she reasonably believed was unlawful conduct and was terminated shortly thereafter. The City has offered legitimate, nondiscriminatory reasons for its decision to terminate Whitley but Whitley has countered those with evidence of pretext based on Asst. Chief Elmore and Chief Sizer's reliance on the recommendation and tainted information of both Lt. Rau and Sgt. Day. Additionally, the court finds that the City's current reliance on Whitley's untruthfulness and her poor performance in firearms, which were not

PAGE 44 - FINDINGS AND RECOMMENDATION                                    {MEP}

cited grounds for Whitley's termination, is also evidence of pretext. Therefore, Whitley has raised a genuine issue of material fact on her federal retaliation claim. The City is not entitled to summary judgment on this claim.

D.  State Retaliation

Whitley also alleges that the City's retaliatory decision to terminate is a violation of OR. REV. STAT. 659.030, Oregon's version of the Title VII retaliation claim. The *prima facie* elements for a retaliation claim under OR. REV. STAT. 659.030 are the same as those under Title VII. *Manatt v. Bank of Am.* 339 F.3d 792, 800 (9th Cir. 2003)(quoting *Ray v Henderson*, 217 F.3d 1234, 1240 (9th Cir. 2000). The court's determination that Whitley has established a prima facie case of retaliation under Title VII applies equally to Whitley's state retaliation claim. The *McDonnell Douglas* three-part burden-shifting analysis is irrelevant to the state retaliation claim, which is before the court on supplemental jurisdiction. Accordingly, the City's motion for summary judgment on Whitley's state retaliation claim also be denied.

E.  State Whistleblower

OR. REV. STAT. 659A.203 provides protection for public whistleblowers. The statute provides that:

> (1)      . . . it is unlawful employment practice for any public employer to:
>
> > (b) Prohibit any employee from disclosing, or take or threaten to take any disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:
> >
> > > (A) A violation of any federal or state law, rule or regulation by the state, agency or political subdivision[.]

OR. REV. STAT. 659A.203(1)(b)(A). The parties agree that the *prima facie* case elements for a

PAGE 45 - FINDINGS AND RECOMMENDATION                              {MEP}

whistleblower claim under OR. REV. STAT. 659A.203 are the same as for Title VII and OR. REV. STAT. 659A.030 retaliation claims. (Defs.' Reply 33.)  However, the City argues that the evidence necessary to support the causation element differs and relies on *Hardie v. Legacy Health Sys.*, 167 Or. App. 425 (2000), in support of this proposition.  In *Hardie*, the court discussed the Oregon Supreme Court's rejection of the "shifting burden of production scheme for 'pretext' claims" and expanded that holding to "mixed motive" claims.  *Id.* at 434-35.  Consequently, under Oregon's interpretation of mixed-motive cases, a plaintiff must show that she would not have been terminated "but-for" her engaging in protected activity, or that, "in the absence of the discriminatory motive, [plaintiff] would have been treated differently." *Id.*   The court is not convinced that this creates a different analysis of the causation element.  To the contrary, it appears that *Hardie* simply applies the same standard used by this court in analyzing Whitley's federal retaliation claim: whether "engaging in the protected activity was one of the reasons for [the adverse employment action] and that but for such activity [the employee] would not have been fired."  *Ruggles v. Cal. Polytechnic St. Univ.*, 797 F.2d 782, 785 (9th Cir. 1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).

Whitley has presented evidence that she engaged in a protected activity under OR. REV. STAT. 659A.203, that she was subsequently terminated, and that there is a causal link between the protected activity and her termination.  This is sufficient to establish a prima face case of whistleblower retaliation.  The City's motion for summary judgment on Whitley's whistleblower claims should be denied.

E.  Wrongful Discharge

The tort of wrongful discharge was established in Oregon "to serve as a narrow exception to

the at-will employment doctrine in certain limited circumstances where the courts have determined that the reasons for the discharge are so contrary to public policy that a remedy is necessary in order to deter such conduct." *Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1127 (D. Or. 1998) (citing *Walsh v. Consol. Freightways, Inc.*, 278 Or. 347, 351-52 (1977); *Sheets v. Knight*, 308 Or. 220, 230-31 (1989)). "The elements of a wrongful discharge claim are simple: there must be a discharge, and that discharge must be wrongful." *Moustachetti v. Oregon*, 319 Or. 319, 325 (1994). Under Oregon law, two circumstances lead to wrongful discharge: "(1) discharge for exercising a job-related right of important public interest, and (2) discharge for complying with a public duty." *Draper*, 995 F. Supp. at 1127 (citing *Sheets*, 308 Or. at 230-31). Examples of "exercising a job-related right" include "filing a workers' compensation claim" and "resisting sexual harassment." *Id.* (citations omitted). Generally, Oregon courts will not "recognize an additional common law remedy for wrongful discharge . . . if existing remedies adequately protect the employment related right." *Carlson v. Crater Lake Lumber Co.*, 103 Or. App. 190, 193 (1990).

Whitley contends that "[b]ecause the standards for establishing a retaliation claim under Title VII, ORS 659A.030(1)(f) and a wrongful discharge claim are virtually identical," the same evidence regarding "plaintiff's statutory retaliation claim dictates the denial of summary judgment as to plaintiff's wrongful discharge claim." (Pl.'s Mem. in Opp. 43.) Specifically, Whitley argues that she was wrongfully discharged because her termination was based on "retaliatory scrutiny" from: "(1) her reports of gender discrimination by Rau, and (2) her utilization of the disability insurance system within the city." (Pl.'s Mem. in Opp. 43.) The City counters that the Court should grant summary judgment on Whitley's wrongful discharge claim because she has an adequate remedy for her wrongful discharge claim under 42 U.S.C. § 1983. (Defs.' Mem. in Supp. 35); *see also Carlson*, 103

PAGE 47 - FINDINGS AND RECOMMENDATION                    {MEP}

Or. App. at 193 (Oregon courts generally will not "recognize an additional common law remedy for wrongful discharge . . . if existing remedies adequately protect the employment related right.").

It has proven difficult to harmonize the Oregon Supreme Court's and the Oregon Court of Appeals' decisions regarding whether a plaintiff can bring a common law wrongful discharge claim while other adequate statutory remedies exist. *See Adams v. Home Depot USA, Inc.*, CV-05-1798-ST, 2007 WL 4565163, *29 (D. Or. Dec. 19, 2007); *Farrington v. Pepsi-Cola Bottling Co. of Bend*, CV-0306297-TC, 2004 WL 817356, *2 (D. Or. Feb. 25, 2004). The Oregon Supreme Court consistently has adhered to its rule that an adequate statutory remedy will preclude a plaintiff's common law wrongful discharge claim, *see Walsh*, 278 Or. at 351, but the court of appeals has "failed to strictly adhere" to that rule. *Draper*, 995 F. Supp. at 1128. Nevertheless, since *Walsh*, both the Oregon Supreme Court and court of appeals have reaffirmed the rule that adequate statutory remedies preclude common law wrongful discharge claims. *See e.g., Delaney v. Taco Time Int'l*, 297 Or. 10, 16 (1984); *Dunwoody v. Haskill Corp.*, 185 Or. App. 605, 614 (2003). Accordingly, this Court, and most courts in this district, holds that "if an adequate statutory remedy exists, a common law wrongful discharge claim based on the same conduct is precluded . . . ." *Reid v. Evergreen Aviation Ground Logistics Enter. Inc.*, CV-07-1641-AC, 2009 WL 136019, *16 (D. Or. Jan. 20, 2009); *Draper*, 995 F. Supp. at 1130-31 ("[A] claim for common law wrongful discharge is not available in Oregon if (1) an existing remedy adequately protects the public interest in question, or (2) the legislature has intentionally abrogated the common law remedies by establishing an exclusive remedy . . . ."). As this Court noted in *Reid*, "the lack of clarity on this point of Oregon common law is not for the federal court in this district to resolve or predict; rather, it is the prerogative of the Oregon Supreme Court." 2009 WL 136019 at *19. Thus, until this Court is redirected by the Oregon Supreme Court, it will

continue to follow the well-recognized rule that an adequate statutory remedy will preclude a wrongful discharge claim.

Whitley has alleged that she was wrongfully discharged in retaliation for reporting gender discrimination and harassment, and for filing an injured worker complaint. (Third Am. Comp. ¶ 74.) The Ninth Circuit has held that the kind of injury suffered by an employee terminated in retaliation for engaging in protected activity does not warrant the provision of a common law remedy of wrongful discharge in addition to the remedies provided under Title VII and Chapter 652 of the Oregon Revised Statutes. *Thomas v. City of Beaverton*, 379 F.3d 802, 813 (9th Cir. 2004). This court recently held that in light of *Thomas,* and the expanded damages provisions under OR. REV. STAT. 659A.030, which include a jury trial, compensatory damages and punitive damages, a plaintiff is adequately protected by statutory remedies and is not entitled to pursue a common law wrongful discharge claim based on retaliation for complaining about discriminatory employment practices. *Battan v. Allwest Underground, Inc.*, No. 08-CV-707-BR, 2008 WL 4191467 (D. Or. Sept. 5, 2008). While it is unclear which statute would protect Whitley from retaliation for filing an injured worker complaint, all of the likely candidates (such as OR. REV. STAT. 659A.040, which covers retaliation for filing for workers' compensation benefits, and OR. REV. STAT. 659A.069, which covers retaliation for applying for benefits as a state worker for health benefits) are found in Chapter 659A of the Oregon Revised Statutes and offer the same benefits as those provided under OR. REV. STAT. 659A.030. *See* OR. REV. STAT. 659A.885. Accordingly, the court finds that Whitley's statutory remedies for her claim alleging that she was wrongfully terminated are adequate.

Whitley's adequate statutory remedies preempt her common law wrongful discharge claim. The City's motion for summary judgment on this claim should be granted.

PAGE 49 - FINDINGS AND RECOMMENDATION                                    {MEP}

F.  Equal Protection Claim

Whitley claims that Sgt. Day, while acting under color of state law, violated Whitley's rights to equal protection of the law by treating her differently and holding her to a disparate and unequal standard because of her gender.  (Pl.'s Third Am. Compl. ¶ 42.)  Under 42 U.S.C. § 1983, liability arises when a person, acting under color of law, "subjects, or causes to be subjected" another person to the deprivation of particular rights.  *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).  To prevail in an equal protection claim, the plaintiff must prove that the defendant "acted in a discriminatory manner and that the discrimination was intentional."  *FDIC v. Henderson*, 940 F.2d 465, 472 (9th Cir. 1991) (citation omitted).  Intentional discrimination means that the defendant acted "at least in part *because of* a plaintiff's protected status."  *Maynard v. San Jose*, 37 F.3d 1396, 1404 (9th Cir. 1994).  To survive a defendant's motion for summary judgment, plaintiff must "only produce evidence sufficient to establish a genuine issue of fact as to the defendant's motivations."  *Henderson*, 940 F.2d at 472.

Sgt. Day correctly asserts that "to hold [him] accountable, Whitley must allege that he committed an act which deprived Whitley of her constitutional right to equal protection."  (Defs.' Mem. in Supp. 36); *see Arnold*, 637 F.2d at 1355.  He argues that he "did not take any actions that deprived Whitley of her constitutional rights," and further points out that "Whitley admits that [he] has never made any comments or statements from which she or this court can infer a discriminatory intent" because she admitted that he "did not make harassing statements," nor did he "make comments regarding her gender." (Defs.' Mem. in Supp. 37 (citing Defs.' CSMF ¶ 68-69).)  Whitley responds that she "need not have direct evidence of discrimination by Day" because she only "must provide evidence of disparate treatment."  (Pl.'s Mem. in Opp. 47.)  Whitley lists numerous acts that

she believes constitute disparate treatment by Sgt. Day, including recording conversations Sgt. Day had with other Bureau officials about Whitley without obtaining consent; contacting Bureau officials to discuss Whitley's performance; failing to take into consideration Whitley's concerns that her performance was impacted by sexual harassment, retaliation, and her knee injury; and adopting Officer Schilling's recommendation for a Review without considering possible mitigating factors. (Pl.'s Mem. in Opp. 45-46.) But Whitley fails to link these actions to some discriminatory motive or intent, nor does she present evidence that Sgt. Day treated Whitley differently than others because of her gender. Therefore, there is no genuine issue of material fact regarding whether Sgt. Day acted in a discriminatory manner toward Whitley, and Sgt. Day's motion for summary judgment on Whitley's equal protection claim should be granted.

*Conclusion*

For the foregoing reasons, Defendants' motions for summary judgment on Whitley's state and federal gender discrimination claims, wrongful discharge claim, and equal protection claim should be GRANTED, and Defendants' motion for summary judgment on Whitley's federal and state retaliation claims and state whistleblower claim should be DENIED.

Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due no later than **June 4, 2009**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

If objections are filed, any party may file a response within fourteen days after the date the

/ / / / /

/ / / / /

/ / / / /

PAGE 51 - FINDINGS AND RECOMMENDATION                                        {MEP}

objections are filed.  Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

DATED this 20th day of May, 2009.

_____
JOHN V. ACOSTA
United States Magistrate Judge

PAGE 52 - FINDINGS AND RECOMMENDATION                    {MEP}